**Entered on Docket**
**September 27, 2017**
EDWARD J. EMMONS, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

**Signed and Filed: September 27, 2017**

HANNAH L. BLUMENSTIEL
U.S. Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re: | Case No. 16-10211 HLB |
| PATRICK JAMES LEMIEUX, Debtor. | Chapter 7 |
| MARSHAL (FORREST) HEWITT, et al., Plaintiffs, v. PATRICK JAMES LEMIEUX, Defendant. | Adv. Proc. No. 16-03065 HLB |

**MEMORANDUM DECISION**

## I. INTRODUCTION

This matter came before the court on the complaint of Plaintiffs Marshal Hewitt, Adam Jenkins, and Michael Ross. The complaint sought denial of Defendant Patrick LeMieux's discharge, pursuant to 11 U.S.C. §§ 727(a)(2)(A), (a)(3), (a)(4)(A), (a)(4)(D) and/or (a)(5), or in the alternative, an order declaring the specific debt owed by Mr. LeMieux to

Messrs. Hewitt, Jenkins, and Ross nondischargeable, pursuant to section 523(a)(6).[1]

On June 8, 2017, the court granted in part and denied in part Mr. LeMieux's motion for summary judgment. The court granted that motion with respect to the claims raised under sections 523(a)(6), 727(a)(2)(A), 727(a)(3), and 727(a)(4)(D). With respect to the claim for relief under section 727(a)(4)(A), the court granted summary judgment as to the alleged failure to disclose, as well as alleged false testimony regarding, loans from a bank account belonging to Mr. LeMieux's wholly owned company, Soft Flow Water Treatment LLC ("Soft Flow").[2] The court denied summary judgment as to the alleged failure to disclose Mr. LeMieux's total income from Soft Flow. Finally, the court denied summary judgment as to the claim for relief under section 727(a)(5) with respect to certain ATM and over-the-counter withdrawals from the Soft Flow account.[3]

The court held a trial on the surviving claims for relief on July 7, 2017. Messrs. Hewitt, Jenkins, and Ross appeared pro se. Mr. Jacob Faircloth appeared on behalf of Mr. LeMieux. After both sides presented their testimony and evidence, the court took the matter under submission.

---

[1] Unless otherwise noted, all statutory citations shall refer to Title 11 of the United States Code, aka the "Bankruptcy Code," and any references to rules shall refer to the Federal Rules of Bankruptcy Procedure.

[2] Soft Flow sets up equipment and accounts for water filtration systems and then sells those accounts to third parties.

[3] The court will refer to the ATM and counter withdrawals collectively as "Cash Withdrawals" which include both Mr. LeMieux's personal and Soft Flow's business expenses. The court will refer to the portion of Cash Withdrawals used only for Mr. LeMieux's personal expenses as "Personal Withdrawals."

This memorandum decision constitutes the court's findings of facts and conclusions of law as required by Federal Rule of Civil Procedure 52(a)(1), which applies in this proceeding pursuant to Rule 7052.

## II. JURISDICTION

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a), and General Order 24 of the United States District Court for the Northern District of California. This is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(I) and (J). Venue is proper under 28 U.S.C. § 1409(a).

## III. FINDINGS OF FACT

Between 2008 and 2011, attorney Brian Katz represented Mr. LeMieux in a variety of legal matters. Mr. LeMieux, Mr. Katz, and Messrs. Hewitt, Ross, and Jenkins were members of an organization called "Yeyoung Culture Studies." In August 2011, Mr. LeMieux hired Messrs. Hewitt, Ross, and Jenkins to work for his company, Standard Fulfillment Services LLC ("Standard"). Standard was a marketing company associated with LeMieux Annuity and Insurance Services, an insurance agency formed by Mr. LeMieux. About a month after hiring Messrs. Hewitt, Ross, and Jenkins, Mr. LeMieux fired them in an attempt to cut ties with Yeyoung Culture Studies. Messrs. Hewitt, Ross, and Jenkins then filed complaints with various government agencies regarding Mr. LeMieux's business practices and disseminated those complaints to the public.

In April 2013, Mr. Katz filed suit in state court against Mr. LeMieux for unpaid attorney's fees. Believing Mr. Katz had

disclosed confidential information to Messrs. Hewitt, Ross, and Jenkins to fuel their complaints, Mr. LeMieux filed a cross complaint against Mr. Katz and Messrs. Hewitt, Ross, and Jenkins asserting four causes of action: (1) libel; (2) intentional interference with prospective economic advantage; (3) intentional infliction of emotional distress; and (4) negligent infliction of emotional distress. Messrs. Hewitt, Ross, and Jenkins responded with an Anti-SLAPP[4] motion, which the state court granted with respect to all of Mr. LeMieux's causes of action except libel.[5] The state court then entered a judgment in favor of Messrs. Hewitt, Ross, and Jenkins for certain attorney's fees and costs in the amount of $22,906.18. As of the commencement of this adversary proceeding, the balance due on that judgment totaled $25,202.46.

On March 16, 2016, Mr. LeMieux filed a voluntary petition under Chapter 7 of the Bankruptcy Code, along with his schedules and Statement of Financial Affairs ("SOFA"), in which he disclosed his income, expenses, assets, and liabilities. Messrs. Hewitt, Ross, and Jenkins take issue with the veracity of Mr. LeMieux's disclosures, alleging that he failed to disclose income he received from Soft Flow in the form of Cash Withdrawals, that

[4] California's Anti-SLAPP statute provides: "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Cal. Code Civ. Proc. 425.16(b)(1).

[5] California's Anti-SLAPP statute makes mandatory an award of attorney's fees and costs to a prevailing defendant on a special motion to strike (an "Anti-SLAPP motion"). Cal. Code Civ. Proc. § 425.16.



Case: 16-03065 Doc# 108 Filed: 09/27/17 Entered: 09/27/17 09:43:31 Page 4 of 29

he failed to account for where that income went, and that he used Soft Flow to hide his income from his creditors. On that basis, they seek denial of Mr. LeMieux's discharge pursuant to sections 727(a)(4)(A) and (a)(5).

**A. Key Exhibits**

To demonstrate that Mr. LeMieux had failed to report income from Soft Flow and had failed to adequately account for the disposition of Cash Withdrawals from Soft Flow, Messrs. Hewitt, Jenkins, and Ross relied primarily on Exhibits 6 and 7, which are excerpts Mr. Hewitt extracted from the Soft Flow's general ledger ("General Ledger"); and Exhibit 12, which is Mr. LeMieux's response to Plaintiffs' Interrogatory number 13. As an initial matter, the court notes that Messrs. Hewitt, Ross, and Jenkins focused on Mr. LeMieux's gross income during the one year period prior to the filing of Mr. LeMieux's petition (March 16, 2015 – March 15, 2016, the "Prepetition Period"). Neither section 727(a)(4)(A) nor section 727(a)(5) has such a temporal limitation. Instead, the focus should have been on the gross income reported on Mr. LeMieux's bankruptcy documents: on Schedule I (current monthly income) and on the SOFA (gross income for the years 2014 and 2015, and 2016 income up to the petition date). The court calculated income for these periods to the extent possible based on the evidence introduced at trial.

Exhibit 6 is titled "Edited Ledger generated by Plaintiff Marshal Hewitt, which omits charges prior to March 16, 2015 to give totals for the year before bankruptcy." Mr. Hewitt testified that Exhibit 6 represented his edited version of the

General Ledger and included only “member draws” taken during the year prior to the petition date.

The ledger entries in Exhibit 6, however, go back as far as January 2014 and only include January - August of 2015. So, contrary to its title and Mr. Hewitt’s testimony, it does not cover the entire Prepetition Period. It also does not provide a complete picture of the 2015 calendar year and contains no information about Mr. LeMieux’s 2016 year to petition date income.

Mr. Hewitt included in Exhibit 6 the following categories of transactions, which he and his co-plaintiffs deemed to represent Mr. LeMieux’s income from Soft Flow: “member draws,” “ATM withdrawals,” “Charter Oak improvements,” “counter withdrawals,” “Debby’s insurance business,” “life insurance,” “medical,” “tickets,” “transfer to personal account,” “tuition,” and “member draws – other.” Both Mr. LeMieux and his former accountant, Manuel Pinto testified that generally, the “ATM withdrawals,” “counter withdrawals,” and “member draws” categories included both personal and business expenses that would be reconciled periodically as personal or business-related prior to preparation of a tax return. In sum, Exhibit 6 does appear to provide accurate information for 2014, for which a tax return had been prepared and the personal and business expenses sorted out. It provides only partial and unreliable information for 2015, as Mr. Pinto stopped working for Mr. LeMieux in June 2015, did not prepare a 2015 tax return, and therefore had not completed the reconciliation of 2015 “member draws” “ATM withdrawals” and “counter withdrawals” to the appropriate category: personal or

business expenses. Finally, Exhibit 6 is of no use for calculating Mr. LeMieux’s 2016 income to the petition date, or his estimated current income.

Exhibit 7 is titled “Edited Ledger generated by Plaintiff Marshall Hewitt, which omits charges after December 31, 2014 to give totals for the year 2014.” Contrary to its title, Exhibit 7 includes 2014 transactions as well as those that occurred from January –August 2015. In addition, Exhibit 7 clearly includes Soft Flow’s business expenses in categories such as “freight charges,” “job materials” and “water filtration systems.” So, Exhibit 7 covers the same time period as Exhibit 6, but includes Soft Flow’s obvious business expenses. In other words, Exhibit 7 provides nothing beyond what Exhibit 6 contains to help determine Mr. LeMieux’s income, and in fact makes any such determination more difficult by including Soft Flow’s business expenses.

Exhibit 12 is Defendant’s Response to Amended Interrogatory 13, in which Mr. LeMieux gave his “approximation and estimates” of the disposition of Cash Withdrawals during the Prepetition Period.

Mr. LeMieux relies primarily upon his Exhibit J, entitled “Soft Flow Cash/ATM Withdrawals” to show the disposition of the Cash Withdrawals during the Prepetition Period. Mr. LeMieux testified that he prepared Exhibit J for purposes of trial. The court has compared Exhibit J to Exhibit 12 and finds that Exhibit J provides a more detailed accounting of the Cash Withdrawals, including references to specific cashier’s checks in Defendant’s

Exhibit I.[6] Further, Mr. LeMieux, to his own detriment, allocated more of the Cash Withdrawals to his personal expenses than he did in Exhibit 12, enhancing the credibility of Exhibit J.

**B. Testimony at Trial**

Witnesses at trial included Mr. LeMieux; Mr. Pinto; Mr. Pinto's former employee, Brett Gunari; Mr. LeMieux's former spouse, Debra Curry; and Mr. Hewitt. The court found all testimony to be credible, except that of Mr. Hewitt with respect to his mathematical calculations, which the court finds unreliable.

**1. Mr. Pinto's Testimony**

Mr. Pinto testified that the "member draws" column in the General Ledger did not represent Mr. LeMieux's gross income. Rather, that column was automatically populated from Soft Flow's bank statements and included Mr. LeMieux's personal expenses, principle payments on loans, and non-deductible business expenses. Mr. Pinto further testified that he would discuss periodically the "member draws" column with Mr. LeMieux to identify the specific nature of each transaction as business or personal.

Mr. Pinto testified that not all Cash Withdrawals were attributable to Mr. LeMieux's personal expenses; some Cash Withdrawals represented business expenses. Mr. Pinto stated that he approached designation of the "member draws" items conservatively; any item that Mr. Pinto concluded was not a

---

[6] Exhibit I was admitted into evidence only to the extent that Exhibit J referred to it.



Case: 16-03065 Doc# 108 Filed: 09/27/17 Entered: 09/27/17 09:43:31 Page 8 of 29

deductible business expense was, for tax purposes, designated a personal expense of Mr. LeMieux.

Mr. Pinto testified that he stopped performing accounting services for Mr. LeMieux and Soft Flow in June 2015, clarifying that the General Ledger was not reconciled through that date because they were working on expenses for prior months.

**2. Mr. Gunari's Testimony**

Mr. Gunari testified only briefly. In relevant part, he attested that he perceived Mr. LeMieux as totally honest in all of their dealings, and that Mr. LeMieux's 2014 tax return was the last one Mr. Gunari prepared.

**3. Ms. Curry's Testimony**

Ms. Curry testified that, prior to June 2016, Mr. LeMieux had been satisfying his child support obligation by paying her and their children's rents, college tuition, utilities, and certain household expenses. She testified that sometimes he would pay via money orders or cashier checks directly to the relevant landlord. Sometimes he would put cash directly into her account. She testified that while they were married, Mr. LeMieux did not excel at bookkeeping, did not write everything down, and that he liked to pay in cash. She testified that Mr. LeMieux has never paid court-ordered alimony of $6,000 per month because he could not afford to, and that she believed Mr. LeMieux has always been honest with her about his financial situation.

**4. Mr. LeMieux's Testimony**

Mr. LeMieux testified to his practice of paying personal expenses out of the Soft Flow account, and of reconciling those expenses at the end of the year (with the assistance of his

accountant) on schedule C of his personal tax return. He further testified that this had been his practice for many years and that he has always relied on an accountant to figure out his personal expenses and income at the end of the year.

Mr. LeMieux testified that he never took more cash from Soft Flow than he needed for his immediate expenses. He explained that he had limited cash and was barely scraping by as he tried to build the Soft Flow business. And he stated that he paid by cashier's checks and money orders to avoid bouncing checks. This trial testimony is consistent with his deposition testimony. [Pls.' Ex. 1 at 25:21-25; 38:5-14.]

Consistent with Mr. Pinto's testimony, Mr. LeMieux also testified that the "member draws" column in Soft Flow's General Ledger was a "catch all" for expenses that would be examined later to determine which were personal and which were deductible business expenses. Mr. LeMieux explained that Mr. Pinto would send him a list of questions at the end of the year to confirm the proper characterization of expenses identified as "member draws."

Mr. LeMieux testified that his Exhibit J represented his best estimate of the disposition of Cash Withdrawals during the Prepetition Period (the period emphasized by Messrs. Hewitt, Ross, and Jenkins). He maintained that many of his expenses were fixed and that he had copies of cashier's checks to corroborate his estimates, which he believes to be fairly accurate, if not exactly correct. He described his approach to characterizing expenses as business or personal as "conservative," meaning that



Case: 16-03065 Doc# 108 Filed: 09/27/17 Entered: 09/27/17 09:43:31 Page 10 of 29

he erred on the side of reporting transactions as a personal expenses rather than business expenses.

As of the trial, Mr. LeMieux had not filed his 2015 and 2016 tax returns because he does not have an accountant to prepare them – Mr. Pinto stopped working for Mr. LeMieux in June 2015 because Mr. LeMieux could no longer pay him. Mr. LeMieux stated that he cannot complete the tax returns without an accountant.

Given that he did not have tax returns for 2015 and 2016, the disclosures in Mr. LeMieux's bankruptcy schedules and SOFA represent his best, good faith estimates of income and expenses. Mr. LeMieux explained that he estimated his income for purposes of Schedule I based on the personal bills he paid during a 3-month period in 2016. He testified that he brought his bankruptcy attorney all bills - paid and unpaid - to calculate his expenses for Schedule J.

**5. Mr. Hewitt's Testimony**

Mr. Hewitt testified that, according to his calculations, $27,247 in Cash Withdrawals remained unaccounted for in Mr. LeMieux's Exhibit J. He explained that the Cash Withdrawals labeled "personal expenses" were unaccounted for because, according to Mr. Hewitt, Mr. LeMieux did not adequately explain them.

Mr. Hewitt testified that Exhibit 6 showed $22,654.95 in Cash Withdrawals through August 2015. But it is unclear to the court if Mr. Hewitt limited this calculation to transactions that occurred within the Prepetition Period, or included all transactions in Exhibit 6, i.e., back to January 2014.



Case: 16-03065 Doc# 108 Filed: 09/27/17 Entered: 09/27/17 09:43:31 Page 11 of 29

Mr. Hewitt testified that Plaintiffs' Exhibit 7 consisted of his edited version of the General Ledger as to Soft Flow's 2014 business expenses. Mr. Hewitt stated that the totals for 2014 were consistent with the expenses reported in Mr. LeMieux's 2014 tax return.[7] The court has reviewed Exhibit 7 and agrees that the totals for 2014 correspond with the expenses identified on Mr. LeMieux's 2014 tax return.

Finally, Mr. Hewitt testified that there were a total of $52,026.80 Personal Withdrawals above and beyond the business expenses in the General Ledger during the year prior to the petition date. Plaintiffs' trial brief, however, stated this amount as $54,068.95. It is unclear to the court whether Mr. LeMieux limited his calculations to the year prior to filing as stated, or if they include transactions going back to January 2014, as set forth in Exhibit 6. And since Exhibit 6 did not provide a complete picture of the year prior to the petition date as Mr. Hewitt asserted it did, the court does not know the sources upon which Mr. Hewitt basis this calculation.

Given the gaping holes and inconsistencies in the Plaintiffs' evidence, the court does not find such evidence reliable and will perform its own calculations based on what trustworthy evidence it received.

**C. 2014 Income**

Mr. LeMieux reported gross income of $49,021 on his SOFA for the 2014 calendar year. [Pls.' Ex. 3 at 36.] Mr. Pinto testified that he prepared Mr. LeMieux's 2014 tax return, which

---

[7] As noted previously, Although Exhibit 7 includes Soft Flow expenses for all of 2014, it also includes expenses for January – August 2015.



Case: 16-03065 Doc# 108 Filed: 09/27/17 Entered: 09/27/17 09:43:31 Page 12 of 29

shows combined income from Soft Flow and Ms. Curry's insurance business of $49,021. [Def.'s Ex. G.] Messrs. Hewitt, Ross, and Jenkins did not offer any evidence to counter Mr. Pinto's testimony or the accuracy of the 2014 tax return. In fact, Mr. Hewitt confirmed that the expenses itemized in the 2014 tax return corresponded with the General Ledger. Accordingly, the court finds that Mr. LeMieux accurately reported his 2014 gross income.

**D. 2015 Income**

Mr. LeMieux reported gross income of $96,000 in his SOFA for calendar year 2015. The evidence submitted at trial did not, however, provide a complete and accurate picture of Mr. LeMieux's 2015 gross income that would permit corroboration of the statements in his SOFA. Plaintiff's Exhibit 6 provided information for January 2015 – August 2015; Defendant's Exhibit J provided information for March 2015 – December 2015. The court used these two exhibits to calculate Mr. LeMieux's 2015 income. The calculation, however, is incomplete for the following reasons: (1) Exhibit 6 does not show which Cash Withdrawals were Personal Withdrawals; and (2) Exhibit J does not include any personal expenses paid directly by Soft Flow. With that caveat, the court calculated Mr. LeMieux's 2015 income as follows.

Income from Personal Withdrawals

From March 16, 2015 through December 31, 2015, Mr. LeMieux made Personal Withdrawals in the amount of $109,802.87. [Def.'s Ex. J.] Mr. LeMieux made Cash Withdrawals of $42,889.95 from January 1, 2015 through March 15, 2015. [Pls.' Ex. 6. at 5-7.] But, because Exhibit 6 does not identify whether any of the Cash



Case: 16-03065 Doc# 108 Filed: 09/27/17 Entered: 09/27/17 09:43:31 Page 13 of 29

Withdrawals were for Mr. LeMieux's personal expenses, the court will only consider the $109,802.87 identified in Defendant's Exhibit J.

Income from direct payment of personal expenses

Soft Flow paid the following personal expenses for Mr. LeMieux during January 2015 through August 2015:

- Life Insurance - $2,936.18
- Medical - $727.53
- Tickets - $1,955.76
- Tuition - $6,733.79
- Miscellaneous expenses paid by debit card - $6,575.30

[Pls.' Ex. 6 at 7-10.] In addition, the General Ledger shows direct transfers to Mr. LeMieux's bank account totaling $8,035. The expenses and direct transfers total $26,963.56. The court has no evidence of direct payments of Mr. LeMieux's personal expenses by Soft Flow for the period from September 2015 through December 2015.

Adding together Personal Withdrawals and expenses paid directly by Soft Flow, the court finds that Mr. LeMieux's gross income for 2015 was approximately $136,766.43 ($109,802.87 Personal Withdrawals, plus $26,963.56 personal expenses paid directly by Soft Flow or funds transferred from Soft Flow's account to Mr. LeMieux's personal account). This amount exceeds Mr. LeMieux's reported gross income for 2015 by $40,766.43.

**E. 2016 Year to Petition Date Income**

Mr. LeMieux reported $24,000 year to petition date ("YTD") gross income for 2016 in his SOFA. [Pls.' Ex. 3 at 35.] Mr. LeMieux testified at trial that that he and his bankruptcy



Case: 16-03065 Doc# 108 Filed: 09/27/17 Entered: 09/27/17 09:43:31 Page 14 of 29

attorney calculated the $24,000 from paid bills he brought into his attorney's office. [See also Pls.' Ex. 1 at 16:14-25; 25:12-25; 26:2-10.]

Neither the General Ledger nor Mr. Hewitt's excerpts therefrom (Plaintiffs' Exhibit 6) include any 2016 transactions. Mr. LeMieux provided an accounting of Cash Withdrawals he took from Soft Flow during the 2016 pre-petition period. [Def.'s Ex. J.] Mr. LeMieux's Personal Withdrawals from January 1, 2016 through March 15, 2016 totaled $21,364. [Id.] This amount, plus any of his personal expenses paid directly by Soft Flow, should add up to his total YTD gross income for 2016. Messrs. Hewitt, Ross, and Jenkins did not, however, provide any evidence of Mr. LeMieux's personal expenses paid by Soft Flow in 2016.

Based on the evidence before the court, Mr. LeMieux might have overreported his 2016 YTD gross income by $2,636. This amount could very well be accounted for with evidence of additional personal expenses paid directly by Soft Flow during this period, but the court never received such evidence.

**F. Schedule I Income**

Mr. LeMieux reported monthly gross income of $8,000 on Schedule I. [Pls.' Ex. 3 at 30.] Mr. LeMieux testified that he estimated this amount based on a 3-month average of bills he paid in 2016. Mr. LeMieux's Personal Withdrawals from Soft Flow during the 2.5 months pre-petition average out to $8,545.60 per month. [Def.'s Ex. J.[8]] Mr. LeMieux testified at his deposition

[8] Mr. LeMieux's personal expenses paid directly by Soft Flow in 2016 could make this average higher, but no one introduced that evidence during trial.



Case: 16-03065 Doc# 108 Filed: 09/27/17 Entered: 09/27/17 09:43:31 Page 15 of 29

on February 9, 2017 that his gross income fluctuates from month to month. [Pls.' Ex. 1 at 81:4-6.] So his average monthly gross income could reach $8,000 by the end of 2016.[9] Given that these numbers are reasonably close, the court finds that Mr. LeMieux estimated his monthly gross income as of the petition date as accurately as possible based on the information available to him.

**G. Disposition of Cash Withdrawals**

Messrs. Hewitt, Ross, and Jenkins focused on the Personal Withdrawals Mr. LeMieux made during the Prepetition Period. Mr. Hewitt testified that, in his mind, Mr. LeMieux had not adequately explained the disposition of these funds.

The Personal Withdrawals by Mr. LeMieux for which a disposition has not been specifically identified total $44,433.47. [Def.'s Ex. J.] Mr. LeMieux identified these generally as "personal expenses". [Id.] Mr. LeMieux testified that he used copies of cashier's checks to specifically identify the disposition of the remaining Personal Withdrawals which, in general, went toward rent, what he characterized as "alimony,"[10] and his daughter's expenses. [Id.] Mr. LeMieux provided evidence of the relevant cashier's checks in Defendant's Exhibit I.

---

[9] For example, in June 2015, Mr. Lemieux did not pay any expenses with Cash Withdrawals, whereas in the previous month he paid $12,900 of his personal expenses with Cash Withdrawals. [Def's. Ex. J at 330.]

[10] Mr. LeMieux testified that this category included support payments for his children and was not part of the $6,000 monthly alimony owed to Ms. Curry. Ms. Curry's testimony corroborated that Mr. LeMieux had paid only child support and no alimony.



Case: 16-03065 Doc# 108 Filed: 09/27/17 Entered: 09/27/17 09:43:31 Page 16 of 29

The $44,433.47 of unidentified "personal expenses" averages out to $3,703 per month. Beyond the rent, alimony, and expenses for his daughter, Mr. LeMieux's Schedule J lists the following personal expenses which may account for the $3,703 unidentified "personal expenses":

- Utilities - $940[11]
- Food and housekeeping supplies - $600
- Clothing, laundry and dry cleaning - $400
- Personal care products and services - $100
- Medical and dental - $280
- Entertainment, clubs, recreation, newspapers, and books - $500
- Insurance - $400
- Taxes - $400

[Pls.' Ex. 3 at 33.] These estimated expenses total $3,620. Exhibit 6, however, shows that Soft Flow was directly paying some of the expenses listed on Schedule J, during March – August of the Prepetition Period.

- Insurance - $2,936 = $489/month
- Medical - $690 = $115/month
- Miscellaneous expenses - $6,025 = $1,004/month[12]

These numbers are not reliable, because: (a) some of these miscellaneous expenses could have been paid on behalf of his

---

[11] This category includes electricity, heat, natural gas, water, sewer, garbage collection, telephone, cell phone, internet, satellite, and cable services.

[12] Exhibit 6 includes an expense for parking tickets - $1,954 = $326/month Schedule J does not include a line item that would encompass parking tickets so that expense need not be considered when determining whether Schedule J accounts for the unexplained "personal expenses."

daughter; (b) the court received no evidence that payment of these expenses continued after August 2015 (other than Mr. LeMieux's testimony that Soft Flow paid some of his expenses directly); and (c) Mr. LeMieux testified that his income from Soft Flow (in the form of payment of his expenses directly or through Personal Withdrawals) fluctuated from month to month. But, using what evidence the court has, Soft Flow appeared to be paying approximately $1,608 of the monthly expenses listed on Schedule J. This leaves $2,012 of Schedule J expenses that can account for some of the $3,703 unidentified "personal expenses" Mr. LeMieux paid with Personal Withdrawals from Soft Flow. This leaves an average of $1,691 per month or $20,292 of unidentified "personal expenses" for the Prepetition Period.

**IV. CONCLUSIONS OF LAW**

**A. Denial of discharge pursuant to § 727(a)(4)(A)**

Section 727(a)(4)(A) denies a discharge to any debtor who "knowingly and fraudulently" makes a false oath or account in the course of the bankruptcy proceedings. 11 U.S.C. § 727(a)(4). To succeed on a section 727(a)(4)(A) claim, a plaintiff must show: (1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently. Roberts v. Erhard (In re Roberts), 331 B.R. 876, 882 (B.A.P. 9th Cir. 2005), aff'd and remanded, 241 F. App'x 420 (9th Cir. 2007). A fundamental purpose of § 727(a)(4)(A) is to incentivize a debtor to provide the trustee and creditors with accurate information so that they do not need to conduct costly investigations. Fogel


Case: 16-03065 Doc# 108 Filed: 09/27/17 Entered: 09/27/17 09:43:31 Page 18 of 29

Legwear of Switz., Inc. v. Wills (In re Wills), 243 B.R. 58, 62 (B.A.P. 9th Cir. 1999).

The parties objecting to discharge bear the burden of proof. Fed. R. Bankr. P. 4005. The standard for that burden is a preponderance of the evidence. Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010). “In keeping with the ‘fresh start’ purposes behind the Bankruptcy Code, courts should construe § 727 liberally in favor of debtors and strictly against parties objecting to discharge.” Retz, 606 F.3d at 1196 (internal quotation marks and citation omitted). The “fresh start” policy, however, is limited to the “honest but unfortunate debtor.” Grogan v. Garner, 498 U.S. 279, 286–87 (1991).

At summary judgment, the court concluded that Mr. LeMieux had not disclosed all income he received from Soft Flow, but that genuine issues of material fact existed as to whether this non-disclosure was material or done with the requisite intent. Accordingly, Messrs. Jenkins, Ross, and Hewitt needed to prove the elements of materiality and intent by a preponderance of the evidence in order to prevail at trial.

**1. 2014 Income**

The court has found that Mr. LeMieux accurately reported his gross income for the calendar year of 2014. Accordingly, Messrs. Hewitt, Ross, and Jenkins have not met their burden of proving by a preponderance of the evidence that Mr. LeMieux made a false statement with respect to his 2014 gross income. Therefore, they cannot prevail under section 727(a)(4)(A) with respect to this representation.

**2. 2015 Income**

**a. False Oath**

The court has found that Mr. LeMieux's 2015 gross income was $136,766.43, which is $40,766.43 more than the gross income he reported on the SOFA. A false oath includes a false statement or omission in the debtor's schedules. Roberts, 331 B.R. at 882. Accordingly, the court finds that Mr. LeMieux made a false statement on his SOFA with respect to his 2015 gross income.

**b. Materiality**

Materiality is broadly defined. Id. at 883. "A false statement is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." Id. (quotation marks and citation omitted). To be material, the false statement or omission need not cause direct financial prejudice to creditors. Id. "An omission or misstatement that detrimentally affects administration of the estate is material." Retz, 606 F.3d at 1198. A false statement or omission, however, that has no impact on a bankruptcy case is not material and does not provide grounds for denial of a discharge under § 727(a)(4)(A). Khalil v. Developers Sur. & Indem. Co. (In re Khalil), 379 B.R. 163, 172 (B.A.P. 9th Cir. 2007), aff'd, 578 F.3d 1167 (9th Cir. 2009). A Chapter 7 debtor's non-disclosure of pre-petition income can be material for purposes of 727(a)(4)(A). See Kluge v. RHI/10223 Sepulveda, LLC (In re Kluge), 2013 WL 1459274, at *3 (B.A.P. 9th Cir. Apr. 10, 2013) (affirming finding of materiality when debtor



Case: 16-03065 Doc# 108 Filed: 09/27/17 Entered: 09/27/17 09:43:31 Page 20 of 29

reported zero income from his business when his business made monthly transfers of $2,000 to his wife).

Here, Messrs. Hewitt, Jenkins, and Ross did not present direct evidence of materiality at trial. Based on its own review of the evidence, the court has found that Mr. Hewitt did not disclose $40,766.43 of gross 2015 income. This non-disclosure does not appear to have impacted the bankruptcy estate at all. Mr. Hewitt credibly testified that he put all net business income back into Soft Flow to keep growing the business, and that he limited his personal income from Soft Flow to what he needed to meet his immediate expenses. Messrs. Hewitt, Jenkins, and Ross did not provide any evidence to the contrary. Thus, though Mr. LeMieux underreported his 2015 gross income, he had no net income that could have been administered in the bankruptcy case. See Rafsanjani v. Kuchecki (In re Kuchecki), 2010 WL 6259966, at *5 (B.A.P. 9th Cir. Nov. 29, 2010) (affirming finding that a $79,000 discrepancy between the reported annual income from debtor's business on the original and amended schedules was not material because plaintiff had not considered costs of sales). Further, the misreported income did not affect the administration of the bankruptcy estate. See Wills, 243 B.R. at 64 ("a statement or omission relating to an asset that is of little value or that would not be property of the estate can be material if it detrimentally affects the administration of the estate"). Accordingly, the court finds Mr. LeMieux's false statement regarding his 2015 income to be immaterial.

**c. Intent**

**i. Knowing Failure to Disclose**

Even if the court did find Mr. LeMieux's non-disclosure of a portion of his gross 2015 income to be material, Messrs. Hewitt, Jenkins, and Ross also failed to prove that he omitted the income with the requisite intent. "A person acts knowingly if he or she acts deliberately and consciously." Roberts, 331 B.R. at 883. A false statement resulting from ignorance, carelessness, or recklessness does not rise to the level of "knowing and fraudulent." Id.

The court finds that Mr. LeMieux did not knowingly make the false statement regarding his 2015 gross income. Mr. LeMieux was not adept at maintaining his financial records, and he had not employed an accountant since June 2015. The General Ledger prepared by Mr. Pinto only included Soft Flow's expenses – from which Mr. LeMieux ultimately would derive his gross income – through August 2015. So Mr. LeMieux did not have complete and accurate information on which to base the information he included in his bankruptcy schedules and SOFA.

The court also finds credible Mr. LeMieux's testimony as to the methods he employed to estimate his gross income, namely by taking an average of the bills he had paid during the three months prior to filing. Though this approach did not produce an accurate number, the court finds it to have been reasonable, given Mr. LeMieux's lack of accounting expertise, his long-standing practice of relying on accountants to determine his gross income at the end of the year, and his inability to afford an accountant in the year leading up to his bankruptcy filing.



Case: 16-03065 Doc# 108 Filed: 09/27/17 Entered: 09/27/17 09:43:31 Page 22 of 29

Accordingly, the court concludes that Messrs. Hewitt, Ross, and Jenkins have not proven by a preponderance of the evidence that Mr. LeMieux's false statement regarding his 2015 gross income was done knowingly.

**ii. Fraudulent Failure to Disclose**

And finally, Messrs. Hewitt, Jenkins, and Ross did not meet their burden of showing fraudulent intent. To demonstrate fraudulent intent, a plaintiff must show that (1) the debtor made representations and/or omissions; (2) the debtor knew at the time they were false; (3) the debtor made the representations with the intention and purpose of deceiving creditors; and (4) the representations and/or omissions were material. Roberts at 884 (citing Devers v. Mank of Sheridan (In re Devers), 759 F.2d 751, 753 (9th Cir. 1985)). Constructive fraudulent intent cannot be the basis for the denial of a discharge; a plaintiff must demonstrate actual fraudulent intent. Id.

"A debtor's fraudulent intent may be established by circumstantial evidence or by inferences drawn from his or her course of conduct. []. The requisite intent may be found from the surrounding circumstances." Roberts at 884-85 (citations omitted). While recklessness cannot meet the willfulness requirement of section 727(a)(4), it can be probative of fraudulent intent "where there has been a pattern of falsity or from a debtor's reckless indifference to or disregard of the truth." Khalil, 379 B.R. at 173.

Messrs. Hewitt, Ross, and Jenkins have tried to show that Mr. LeMieux paid his personal expenses through Soft Flow to hide his income from creditors. They have failed in this effort for



Case: 16-03065 Doc# 108 Filed: 09/27/17 Entered: 09/27/17 09:43:31 Page 23 of 29

several reasons. First, it had been Mr. LeMieux's long-standing practice to pay his personal expenses through his business and there is no evidence that he only started doing so to evade creditors. Second, Mr. LeMieux took no money from Soft Flow other than what he needed to pay his immediate expenses. Third, Mr. LeMieux was unable to pay all of his expenses, such as alimony owed to Ms. Curry and fees owed to Mr. Pinto. And finally, Mr. Pinto, Mr. Gunari, and Ms. Curry all testified – credibly – that they found Mr. LeMieux to be honest with them with respect to his finances. Messrs. Hewitt, Ross, and Jenkins have provided no evidence whatsoever that, at the time he filled out his SOFA, Mr. LeMieux knew the 2015 gross income he reported was false or that Mr. LeMieux intended to deceive his creditors.

Accordingly, Messrs. Hewitt, Ross, and Jenkins have not established their claim under section 727(a)(4)(A) with respect to Mr. LeMieux's 2015 gross income.

**3. 2016 YTD Income**

As explained above, the court has found that Mr. LeMieux overestimated his YTD 2016 gross income by $2,636. The court also finds that, based on the evidence, Mr. LeMieux reported his YTD 2016 gross income as accurately as he could with the information available to him. But even if the overestimation constituted a false statement, the court finds it immaterial, especially in light of Messrs. Hewitt, Ross, and Jenkins' allegation that he ***under***reported his income. Accordingly, Messrs. Hewitt, Ross, and Jenkins have not met their burden of demonstrating by a preponderance of the evidence that Mr. LeMieux made a material false statement with respect to his 2016 YTD

gross income and they cannot prevail under section 727(a)(4)(A) with respect thereto.

**4. Schedule I Income**

Schedule I requires only an estimate of a debtor's monthly gross income, not an exact number.[13] Mr. LeMieux's estimate differed from the court's calculation ($8,545.60) by only $545.60 And the court found credible Mr. LeMieux's testimony that his average monthly gross income could change during the course of the year, as Mr. LeMieux's monthly gross income fluctuated. Based upon its evaluation of the evidence, the court finds Mr. LeMieux's estimate to be reasonable and not a false statement. Accordingly, Messrs. Hewitt, Ross, and Jenkins have not met their burden of demonstrating by a preponderance of the evidence that Mr. LeMieux made a false statement on Schedule I. Thus, they cannot prevail on their claim under section 727(a)(4)(A) with respect to Mr. LeMieux's Schedule I income.

In sum, Messrs. Hewitt, Ross, and Jenkins have not established that Mr. LeMieux knowingly and fraudulently made a false statement in his bankruptcy documents. The court will enter judgment in favor of Mr. LeMieux on the claim for relief under section 727(a)(4)(A).

**B. Denial of discharge pursuant to § 727(a)(5)**

Section 727(a)(5) provides that the court shall grant a discharge unless "the debtor has failed to explain satisfactorily, before determination of denial of discharge under

---

[13] The instructions at the top of Schedule I state: "Be as complete and accurate as possible." The instructions at Part 2 regarding monthly income state: "Estimate monthly income as of the date you file this form." [Pls.' Ex. 3 at 30.]

this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). To succeed on a claim for relief under section 727(a)(5), a plaintiff must prove the disappearance of substantial assets, at which point the burden shifts to the debtor to explain the loss of those assets. In re Fader, 414 B.R. 640, 645 (Bankr. N.D. Cal. 2009) (citing Chalik v. Moorefield (In re Chalik), 748 F.2d 616 (11th Cir. 1984) and First Federated Life Ins. Co. v. Martin (In re Martin), 698 F.2d 883 (7th Cir.1983)). A sophisticated business person can be held to a higher standard of accountability and record keeping. Fader, 414 at 645 (citing Meridian Bank v. Alten (In re Alten), 958 F.2d 1226 (3rd Cir. 1992)).

The Ninth Circuit has not defined what constitutes "substantial" assets. Bankruptcy courts in the Ninth Circuit have found a wide range of assets to be substantial enough to require an explanation of the loss thereof by a debtor. In re Fader, 414 B.R. at 644 ($210,000 of income); In re Wiseman, No. 07-10976, 2008 WL 5341023, at *4 (Bankr. W.D. Wash. July 18, 2008) ($65,000 of trust funds); In re Johnson, 68 B.R. 193, 200 (Bankr. D. Or. 1986) ($39,000 of income during one year prior to filing).

At summary judgment, the court found that Mr. LeMieux did not dispute that he took Personal Withdrawals from Soft Flow during the year preceding his bankruptcy case, and admitted that he did not keep records of how he spent that money. Accordingly, the court denied Mr. LeMieux's motion for summary judgment on this claim and found triable issues remained as to whether

substantial assets had disappeared and whether Mr. LeMieux could satisfactorily explain such disappearances.

Messrs. Hewitt, Ross, and Jenkins focused on Personal Withdrawals taken by Mr. LeMieux during the Prepetition Period, asserting that Mr. LeMieux has not accounted for where this cash went. After the court's calculations (based on Plaintiffs' unreliable evidence), $20,292 of the Personal Withdrawals Mr. LeMieux made during the year prepetition remain unaccounted for. That averages out to approximately $55.59 per day of unaccounted for personal expenses. The court does not find this amount to be substantial, especially in light of the possibility that this amount could be far less.

Regardless, the court finds that Mr. LeMieux adequately explained the disposition of the Cash Withdrawals. He credibly testified that they were used for his personal expenses and that he did not have any money to spare beyond those expenses. As to the accounting of those personal expenses, Mr. LeMieux's poor accounting skills do not justify denial of his discharge, particularly where his methods for estimating those expenses were reasonable. "§ 727(a)(5) is not appropriately used to deny a discharge to business operators who through inadvertence, lack of competence, or both, maintain less than pristine financial records." In re Knowling, 2011 WL 5024298, at *5 (Bankr. D. Or. Oct. 20, 2011). No evidence submitted by Messrs. Hewitt, Jenkins, and Ross has persuaded the court that Mr. LeMieux is anything other than an "honest but unfortunate" debtor who should receive a discharge.

The court finds and concludes that Mr. LeMieux has adequately explained that the Personal Withdrawals paid for his personal expenses. Having so found, Messrs. Hewitt, Ross, and Jenkins cannot prevail on this cause of action. Accordingly, the court will enter judgment in favor of Mr. LeMieux on the claim for relief under section 727(a)(5).

## V. CONCLUSION

For the foregoing reasons, the court finds in Mr. LeMieux's favor on all claims raised by Messrs. Hewitt, Jenkins, and Ross and will enter judgment accordingly.

****END OF ORDER****



Case: 16-03065 Doc# 108 Filed: 09/27/17 Entered: 09/27/17 09:43:31 Page 28 of 29

**Court Service List**

Marshal (Forrest) Hewitt
4218 Windsong St.
Sacramento, CA 95834

Adam Jenkins
4218 Windsong St.
Sacramento, CA 95834

Michael Ross
4218 Windsong St.
Sacramento, CA 95834